IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TYRONE A. WRIGHT, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 18-2976 |
| | : | |
| v. | : | |
| | : | |
| NORTHAMPTON COMMUNITY COLLEGE, | : | |
| BRETT LAST (in his individual capacity | : | |
| only), and BELINDA AUSTIN (in her | : | |
| individual capacity only), | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

Smith, J.                                                                          June 8, 2020

The plaintiff, an African American employee at a community college for over a decade, was disappointed to receive the news that he was passed over for a promotion in mid-2015. When the college failed to provide him with what he felt was a sufficient explanation, and upon learning that a younger white female with less experience was ultimately hired for the position, the plaintiff decided to speak up. He filed a charge of discrimination, as he felt that he was already performing many of the position's responsibilities and was arguably the most qualified of those interviewed for the position.

In response to this charge of discrimination, the Pennsylvania Human Relations Commission held a fact-finding conference and various administrators from the college, two of whom are named as defendants, attended this conference. After the conference, the plaintiff felt that his relationship with his supervisors dramatically changed, and they began to undermine his authority, ignore him, and schedule conflicting meetings. The plaintiff complained internally of

discrimination and retaliation, and then filed a second charge of discrimination after warning the college of his intentions.

Shortly thereafter, the plaintiff received his first unsatisfactory performance evaluation in over ten years. Less than two months later, the college placed the plaintiff on a performance improvement plan. The college ultimately fired him for failing to meet the objectives of his performance improvement plan, claiming that the social media plan he presented was not quite thorough enough. The plaintiff again felt that this explanation did not suffice, and he brought the instant suit against the college and several of its administrators alleging age and race discrimination and retaliation.

The defendants have now moved for summary judgment, contending that the plaintiff did not receive the promotion as he was unqualified for the position and that they did not retaliate against him. However, after a careful review of the factual record developed through discovery, the court must deny the motion because genuine issues of material fact exist which preclude entry of judgment as a matter of law.

## I.   PROCEDURAL HISTORY

The plaintiff, Tyrone A. Wright ("Wright"), filed a complaint against the defendants, Belinda Austin ("Austin"), Brett Last ("Last"), and Northampton Community College ("NCC"), on July 17, 2018. Doc. No. 1. Defendants filed a motion to dismiss the complaint on October 29, 2018. Doc. No. 4. Wright responded to the motion to dismiss by filing an amended complaint on November 13, 2018.

In the amended complaint, Wright, a 60-year old black male, alleges that after working for NCC for ten years, NCC reassigned him to work at its Monroe County campus in July 2014, where he reported to Austin, the Associate Dean of Student Services. Am. Compl. at 4–5. In April 2015,

Wright applied for a new position at the main campus, for which he was qualified, but NCC did not interview him. *Id.* at 5–6. NCC instead only interviewed younger, white employees for the position and ultimately hired a younger, white female with "just a few years of college administrative experience." *Id.* at 6, 7. When Wright inquired as to why he did not receive an interview, he received "inconsistent and spurious" responses, including a response that his Master's degree in sports management was not what they wanted. *Id.* at 6–7.

After receiving these responses, Wright filed a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC") and it held a fact-finding conference in August 2016. *Id.* at 7. During the following academic year, Austin's "nature and aggressiveness of [her] supervision [of Wright] changed dramatically." *Id.* This caused Wright to file a second charge with the PHRC in March 2017. *Id.* Wright also submitted an internal complaint within NCC, but Last, NCC's executive director of human resources, determined that the complaint lacked merit. *Id.* at 3, 8.

Wright then received a negative performance evaluation in June 2017, his first during his employment at NCC, which prompted him to file a third charge with the PHRC in August 2017. *Id.* At around this time, Last and Austin placed Wright on a performance improvement plan. *Id.* at 8. In February 2018, Last and Austin informed Wright that he did not meet the requirements of the plan and, as such, they terminated his employment at NCC. *Id.*

Based on these allegations, Wright asserts eight causes of action against the defendants: (1) a violation of 42 U.S.C. § 1981 against NCC for "race discrimination in being denied the 2015 position[;]" (2) a violation of the Pennsylvania Human Relations Act ("PHRA") against NCC for "race discrimination in being denied the 2015 position[;]" (3) a violation of the PHRA against NCC for "age discrimination in being denied the 2015 position[;]" (4) a violation of section 1981

against NCC for "retaliation in being terminated[;]" (5) a violation of section 1981 against Last and Austin in their individual capacities for "retaliation in being terminated[;]" (6) a violation of Title VII against NCC for "retaliation in being terminated[;] (7) violations of the PHRA against all defendants for "retaliation in being terminated[;]" and (8) a violation of the Age Discrimination in Employment Act ("ADEA") against NCC for "retaliation in being terminated[.]"[1] Am. Compl. at 9–17, Doc. No. 5. The defendants then moved to dismiss the entire amended complaint on November 28, 2018. Doc. No. 6.

On December 7, 2018, the court denied the initial motion to dismiss as moot. Dec. 7, 2018 Order, Doc. No. 7. Wright filed a response to the second motion to dismiss on December 17, 2018. Doc No. 10. The defendants filed a reply in support of the motion to dismiss on January 15, 2019. Doc. No. 13. Wright then moved for leave to file a surreply brief, which the court granted on January 23, 2019. Doc. Nos. 14, 15. Wright's surreply brief was docketed the same day. Doc. No. 16.

The court, on May 15, 2019, granted the motion to dismiss in part and denied the motion in part. May 15, 2019 Order, Doc. No. 17. The court dismissed Wright's gender discrimination claims (counts I and IV) without prejudice, but allowed the remaining counts pertaining to race discrimination, age discrimination, and retaliation to proceed to discovery. *Id.* at 1. The defendants filed an answer to the amended complaint on June 11, 2019. Doc. No. 18.

Although the discovery deadline passed on November 22, 2019, *see* Scheduling Order at 1, Doc. No. 21, Wright moved to reopen discovery on December 10, 2019, in response to receiving certain discovery documents from the defendants the day before, which included a written complaint against a key school administrator with allegations of racially offensive statements. Pl.'s

---

[1] Technically, Wright includes nine counts in the amended complaint; however, the seventh and ninth counts appear to be identical causes of action under the PHRA for retaliation. *Compare* Am. Compl. at 15–16, *with id.* at 17.

First Mot. for an Extension of Time to Complete Discovery, Doc. No. 28. The defendants did not oppose the request, and the court granted the motion and entered an amended scheduling order on December 12, 2019. Doc. Nos. 31, 32.

The defendants filed the instant motion for summary judgment on January 24, 2020. Doc. No. 33. After receiving an extension of time, Wright filed his response in opposition to the motion for summary judgment on February 21, 2020, and defendants filed a reply brief in support of the motion for summary judgment on February 28, 2020. Doc. Nos. 37, 39–42. The court then granted leave for Wright to file a surreply on March 5, 2020, and directed the clerk of court to file the reply. Mar. 5, 2020 Order, Doc. No. 45. The next day, the court held oral argument on the motion for summary judgment. The motion is now ripe for resolution.

## II.   UNDISPUTED FACTS

Wright is an African-American male born on January 16, 1958. *See* Pl.'s Enumerated Statement of Facts from Pl.'s Opp. to Summ. J. ("PSOF") at ¶¶ 1–2, Doc. No. 41; Am. Compl. at ¶ 2, Doc. No. 5; Defs.' Answer with Affirmative Defenses to Pl.'s Am. Compl. ("Answer") at ¶ 2, Doc. No. 18. Wright has a background in athletics, and he possesses a Master's degree in sports management. *See* Defs.' Facts at ¶ 2, Pl.'s Resp. at ¶ 2. In September 2004, Wright began working for NCC as a Student Services Administrator at its Monroe campus. *See* Defs.' Statement of Material Facts ("Defs.' Facts") at ¶ 1, Doc. No. 33-1; Pl.'s Responses to Defs.' Statement of Material Facts ("Pl.'s Resp." ) at ¶ 1, Doc. No. 40; PSOF at ¶ 7; Am. Compl. at ¶ 11; Answer at ¶ 11. After approximately a year, Wright transferred to NCC's main campus in Bethlehem to assume the position of Student Success Administrator. *See* Am. Compl. at ¶ 12; Answer at ¶ 12; Pl.'s Resp. at ¶ 1; PSOF at ¶¶ 7–8; Pl.'s Br. Opposing Defs.' Mot. for Summ. J. ("Pl.'s Opp'n Br."), Ex. 1, Decl. of Tyrone A. Wright Pursuant to 28 U.S.C. § 1746 ("Wright Decl.") at ¶ 3, Doc. No. 39-1.

Wright worked as the Student Success Administrator for approximately nine years. *See* PSOF at ¶ 9; Am. Compl. at ¶ 13; Answer at ¶ 13. Wright's performance reviews for each of those years reflected "Meets Expectations." *See* PSOF at ¶ 9; Pl.'s Opp'n Br., Ex. 26, 2005-2014 Performance Reviews ("Performance Reviews"), Doc. No. 39-26. When Wright's position at NCC lost its grant funding, NCC reassigned him back to its Monroe Campus as a Student Success/Physical Fitness Services Administrator. *See* Defs.' Facts at ¶ 3; Pl.'s Resp. at ¶ 3; PSOF at ¶ 14. His responsibilities in this new position included overseeing the gym and fitness area, teaching a course on student skills and time management to first-time freshmen, and advising students. *See* Defs.' Facts at ¶¶ 5–6; Pl.'s Resp.at ¶¶ 5–6.

In his new position, Wright reported to Austin, an African-American woman who served as Associate Dean of Students for the Monroe campus. *See* Defs.' Facts at ¶¶ 7–8; Pl.'s Resp. at ¶¶ 7–8. After a colleague's resignation, Austin decided to temporarily appoint Wright to the position of Student Life and Leadership Development Administrator, which paid an extra $600 per month. *See* Defs.' Facts at ¶ 10; Pl.'s Resp. at ¶ 10; Am. Compl. at ¶ 16; Answer at ¶ 16; Pl.'s Opp'n Br., Ex. 3, NCC Posting ("Posting"), Doc. No. 39-3. Wright served in this additional capacity until the end of the 2015 spring semester. *See* Defs.' Facts at ¶ 11, Pl.'s Resp. at ¶ 11.

While serving in the additional capacity of a Student Life and Leadership Development Administrator, Wright applied for the position of Assistant Director of Student Life and Leadership Development on April 4, 2015. *See* Defs.' Facts at ¶ 13; Pl.'s Resp. at ¶ 13. No one from NCC informed or consulted Austin about Wright's candidacy for the Assistant Director position, and she only knew that Wright had applied because he told her. *See* Defs.' Facts at ¶ 14; Pl.'s Resp. at ¶ 14. NCC formed a search committee of its faculty to review applicants' qualifications for the Assistant Director position, and the search committee considered both external and internal

candidates. *See* Defs.' Facts at ¶¶ 15, 18; Pl.'s Resp. at ¶¶ 15, 18. Frank Pologruto ("Pologruto"), Director of Student Life and Leadership Development, was to be in charge of overseeing the Assistant Director. *See* Defs.' Facts at ¶ 24; Pl.'s Resp. at ¶ 24; Am. Compl. at ¶ 18; Answer at ¶ 18. Pologruto, a white male, was also the hiring manager for the position and the chair of the search committee. *See* Wright Decl. at ¶ 7; Posting at 1; Pl.'s Opp'n Br., Ex. 30, Dep. of Elba Carides ("Carides Dep.") at 21, Doc. No. 39-30. Pologruto informed Wright that he had not been selected for an interview for the position.[2] *See* Defs.' Facts at ¶ 21; Pl.'s Resp. at ¶ 21.

On May 19, 2015, Wright sent a letter to search committee members expressing his frustration at not being granted an interview, but he did not indicate that he perceived discrimination on the basis of age or race. *See* Defs.' Facts at ¶ 25; Pl.'s Resp. at ¶ 25. At the time that Wright sent this letter, he was unaware of whom NCC hired for the position. *See* Defs.' Facts at ¶ 26; Pl.'s Resp. at ¶ 26. NCC ultimately chose Jessica Adler Errington, who possesses a Master's of Education in Higher Education Administration, to fill the position. *See* Defs.' Facts at ¶ 27; Pl.'s Resp. at ¶ 27; Pl.'s Opp'n Br., Ex. 12, Resume of Jessica M. Adler Errington, Doc. No. 39-12. The search committee only interviewed five candidates, all of whom were white. *See* PSOF at ¶¶ 27–41.

On July 24, 2015, Wright filed a charge of discrimination with the PHRC. *See* PSOF at ¶ 44; *see also* Pl.'s Opp'n Br., Ex. 14, Am. Compl. with PHRC (amending Wright's original charge

---

[2] There are several factual disputes over why Wright was not extended an interview, including what Wright was told after not being extended an interview, whether Wright met the qualifications for the position, and who supported Wright's candidacy for the position. Defs.' Facts at ¶¶ 17–22; Pl.'s Resp. at ¶¶ 17–22. The court will discuss these factual disputes later in this opinion. There is also evidence in the record that Pologruto has referred to black men as loud, drunk, and high on drugs. *See* Pl.'s Opp'n Br., Ex. 5, Decl. of Hannah Leidich Pursuant to 28 U.S.C. § 1746, Doc. No. 39-5; PSOF at ¶ 22. This evidence does not appear to be disputed, Pologruto only testified that he has no recollection of the incident due to having a "blackout" with "disassociation," but this evidence will also be discussed later in the opinion as opposed to in this section. *See* Pl.'s Opp'n Br., Ex. 6, Dep. of Frank B. Pologruto ("Pologruto Dep.") at 8–11, Doc. No. 39-6.

of discrimination filed on July 24, 2015), Doc. No. 39-14. In August 2016, the PHRC convened a fact-finding conference in Harrisburg. *See* PSOF at ¶ 45; *see also* Pl.'s Opp'n Br., Ex. 15, Notice of Fact-Finding Conference, Doc. No. 39-15. Last, Austin, and Pologruto were there on behalf of NCC, along with NCC's lawyer. *See* PSOF at ¶ 54; Wright Decl. at ¶ 9.

Just a few months before the August 2016 PHRC fact-finding conference, Austin had provided Wright with a favorable performance review. *See* PSOF at ¶ 47; *see also* Pl.'s Opp'n Br., Ex. 16, May 13, 2016 Performance Review ("May 2016 Performance Review"), Doc. No. 39-16. In 2014-2015, Wright had also received a favorable review from Austin. *See* PSOF at ¶ 47; *see also* Pl.'s Opp'n Br., Ex. 39, May 21, 2015 Performance Review ("May 2015 Performance Review"), Doc. No. 39-39.

At an administrative staff meeting in April 2016, all administrators, including Wright, were informed of changes to the evaluation process for administrators that would focus on individual goal setting beginning in the 2016-17 school year. *See* Defs.' Facts at ¶ 28; Pl.'s Resp. at ¶ 28. On June 1, 2016, Last, NCC's Director of Human Resources, confirmed the new evaluation process with all administrators, including Wright, and instructed administrators to begin meeting with their supervisors to set individual goals. *See* Defs.' Facts at ¶ 29; Pl.'s Resp. at ¶ 29. These goals were supposed to relate to NCC's strategic plan and mission and follow the "SMART" paradigm, *i.e.*, specific, measurable, attainable, realistic and time-bound. *See* Defs.' Facts at ¶ 31; Pl.'s Resp. at ¶ 31.

In July 2016, Wright engaged with Austin to properly formulate goals for the 2016-17 school year, which they both approved and submitted to Human Resources to become part of Wright's personnel file. *See* Defs.' Facts at ¶ 32; Pl.'s Resp. at ¶ 32. Wright then proceeded to change his original goals without getting approval from Austin. *See* Defs.' Facts at ¶ 33; Pl.'s

Resp. at ¶ 33. When completing a self-evaluation, Wright initially used the wrong goals by using the revised goals that he had not submitted to Austin, as opposed to the original goals. *See* Defs.' Facts at ¶ 34; Pl.'s Resp. at ¶ 34. When Wright received an Administrative Performance Review for the 2016-17 academic year on June 16, 2017, he discovered that he was rated "unsatisfactory." *See* Defs.' Facts at ¶ 36; Pl.'s Resp. at ¶ 36.

On August 16, 2017, Last and Austin placed Wright on a 90-day performance improvement plan ("PIP") to be completed by November 30, 2017. *See* Defs.' Facts at ¶ 43; Pl.'s Resp. at ¶ 43; Am. Compl. at ¶ 32; Answer at ¶ 32. After Last and Austin placed him on the PIP, Wright submitted a complaint of retaliation to Mark Erickson, President of NCC, and Sedgwick Harris, Vice President of Student Affairs & Enrollment, on August 21, 2017. *See* PSOF at ¶ 56; Pl.'s Opp'n Br., Ex. 24, Aug. 21, 2017 E-Mail; Wright Decl. at ¶ 13. Subsequently, Last and Austin extended the time for Wright to complete the PIP. *See* Defs.' Facts at ¶ 44; Pl.'s Resp. at ¶ 44; PSOF at ¶ 57; Am. Compl. at ¶ 32; Answer at ¶ 32.

The PIP required Wright to meet with Troy Tucker ("Tucker"), Director of Athletics, at least three times before December 30, 2017, which Wright accomplished. *See* Defs.' Facts at ¶ 48; Pl.'s Resp. at ¶ 48; Pl.'s Opp'n Br., Ex. 41, E-Mail Messages ("E-Mails"), Doc. No. 39-41. At these meetings, Wright and Tucker discussed using social media engagement to interact with students and to meet the requirements of the PIP. *See* Defs.' Facts at ¶ 49; Pl.'s Resp. at ¶ 49; E-Mails.[3]

On February 8, 2018, Austin, Harris, and Last informed Wright they were terminating his employment based on unsatisfactory job performance and for failure to fulfill the requirements of

---

[3] There is disputed evidence in the record over whether Wright provided a sufficiently thorough plan to promote the Monroe campus's recreational facility on social media and whether he fulfilled the requirements of the PIP, which the court discusses later in this opinion. Defs.' Facts at ¶¶ 49–56; Pl.'s Resp. at ¶¶ 49–56.

the extended PIP. *See* Defs.' Facts at ¶¶ 62–63; Pl.'s Resp. at ¶¶ 62–63. Despite the PIP's emphasis on using social media to promote the Monroe campus athletic program and facilities, in the 20 months after NCC fired Wright, there were a total of only six tweets promoting the Monroe campus recreational/athletic programs. *See* PSOF at ¶ 62; *see also* Pl.'s Opp'n Br., Ex. 34, Post-Termination Tweets (2/18-10/19) ("Post-Termination Tweets"), Doc. No. 39-34.

## III.   DISCUSSION

### A.   Standard of Review – Motion for Summary Judgment

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine

issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252.

Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments included in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

11

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Nonetheless, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.   Analysis

### 1.   Failure to Promote Discrimination Claims

Wright claims NCC discriminated against him on the bases of his race and age when it did not even interview him for the position of Assistant Director, Student Life and Leadership Development at the main campus. For PHRA cases alleging racial and age discrimination, the court evaluates the claims under the same framework as Title VII and ADEA claims. *See Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 n.1 (3d Cir. 2005) ("The same legal standard applied to both the ADEA and the PHRA and therefore it is proper to address them collectively." (citing *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 509 n.2 (3d Cir. 2004))); *Weston v. Pennsylvania*, 251 F.3d 420, 425 n.3 (3d Cir. 2001) (explaining that courts analyze PHRA claims under same framework as Title VII claims). As Wright has not provided direct evidence of discrimination, the court must

evaluate his claims under Title VII, the ADEA, and the PHRA, under the burden shifting framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Burton v. Teleflex Inc.*, 707 F.3d 417, 425–26 (3d Cir. 2013) ("Because Burton has not provided direct evidence of discrimination, our inquiry under [the ADEA and Title VII] is governed by the three-part framework established in [*McDonnell Douglas.*]"); *Petrikonis v. Wilkes-Barre Hosp. Co., LLC*, 582 F. App'x 126, 129 (3d Cir. 2014) ("Because Petrikonis has not provided direct evidence of discrimination, we analyze his claims arising under Title VII, the ADEA, and the PHRA under the burden-shifting analysis set forth in [*McDonnell Douglas.*]").[4]

Under this framework, a plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802. If the plaintiff is able to do so, then the burden shifts to the defendant to "to articulate some legitimate, nondiscriminatory reason" for the action taken. *Id.* If the defendant meets this burden, then the burden shifts back to the plaintiff to present "some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely that not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (citations omitted). To establish a *prima facie* case of discrimination, a plaintiff must show (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was subjected to adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008) (citations omitted). Here, the court finds that Wright has met this initial burden.

---

[4] The parties agree that the court should apply the *McDonnell Douglas* framework to this case. *See* Defs.' Br. in Supp. of Mot. for Summ. J. or, Alternatively, Partial Summ. J. ("Defs.' Br.") at 4–5, Doc. No. 33-2; Pl.'s Opp'n Br. at 15–16.

The defendants maintain that Wright cannot establish that he was qualified for the position or that he was denied the position under circumstances that give rise to an inference of discrimination. Defs.' Br. at 5–10. They rely on the case of *Dowdell v. Community College of Philadelphia*, 725 F. App'x 198, 200 (3d Cir. 2018), where the Third Circuit affirmed the district court's decision granting summary judgment to the Community College of Philadelphia in a case involving allegations by an African-American male who alleged that the college's failure to promote him from a part-time to full-time position constituted discrimination on the basis of race and gender. *Id.* at 6.

In *Dowdell*, the faculty position at issue required a "Master's or Ph.D. degree in English, Composition, or [a] closely-related field." *Dowdell,* 725 F. App'x at 199. "The College further defined a 'closely-related field' to mean at least eighteen credits in 'advanced study in language, literature, developmental English or reading.'"[5] *Id.* (quoting record). Dowdell possessed a Master's degree in "Film," which the college did not consider to be "closely related" to English or Composition. *Id.* at 200. In addition, the college closely reviewed Dowdell's academic transcript after he advanced to the third round of interviews and it determined that his coursework in English was insufficient to meet the 18-credit course requirement. *Id.* Based on this record, the Third Circuit held that "Dowdell did not meet the minimum educational standards for the position and therefore failed to establish a prima facie case under *McDonnell Douglas*." *Id.* at 201.

In this case, the job description stated that a qualified candidate must have a "Master's Degree in Higher Education, Student Personnel or related field." Pl.'s Opp'n Br., Ex. 3. Wright has a Master's degree in Sports Management, which the defendants maintain is not a related field and they therefore argue that Wright did not meet the minimum education requirements for the

---

[5] At the time he applied for the job, Dowdell was a part-time faculty member. *See Dowdell*, 725 F. App'x at 201 (referencing Dowdell's argument that he was a "part-time employee of the English Department").

position. However, unlike in *Dowdell*, Wright has supplied evidence that the NCC has not strictly enforced the degree requirements in the past and that he met the qualifications for the job by establishing that he was already performing many of the responsibilities of the position by serving as the acting Student Life and Leadership Development Administrator at the Monroe campus.

According to Wright's version of events, Elba Carides ("Carides"), a member of the search committee, initially supported his application as she believed he was qualified for the position. Wright Decl. at ¶ 5. Furthermore, Wright maintains that NCC did not rigidly enforce the job posting's degree requirements and they broadly construed the term "related field." *See* PSOF at ¶ 44 n.7. For example, in July 2015, NCC interviewed a white female who was under 40 years old, and she was one of two finalists for the position of a Student Life & Leadership Development Administrator at the Monroe campus. This position could be viewed by a reasonable factfinder as similar to the Assistant Director of Student Life and Leadership Development position at the main campus that Wright had applied for around the same time in 2015. The Monroe campus position also required a Master's degree in Higher Education/Student Personnel, yet one of the two finalists had a Master's of Fine Arts, Interdisciplinary Arts, instead of in Higher Education/Student Personnel, and other than being a resident advisor and office assistant in college, this finalist did not have student services experience. Pl.'s Opp'n Br., Ex. 40. Furthermore, Pologruto, the head of the search committee, also did not have a Master's degree in Higher Education, Student Personnel, or a related field. Carides Dep. at 26–27. Taking these facts in the light most favorable to Wright, he has met his *prima facie* burden of demonstrating he was qualified for the position despite lacking a Master's degree in Higher Education/Student Personnel.

The defendants further maintain that Wright cannot establish a *prima facie* case, as he must prove they denied him the position under circumstances that could give rise to an inference of

discrimination and such circumstances do not exist here. A plaintiff can demonstrate an inference of discrimination by showing that the defendant treated more favorably similarly situated employees not in the plaintiff's protected class.[6] *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013). In this case, NCC hired a substantially younger, white employee for the position at issue and it only interviewed white candidates. Pl.'s Opp'n Br., Exs. 7, 8, 12. *Cf. Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004) (explaining that plaintiff seeking relief under ADEA must demonstrate, *inter alia*, that "her replacement was sufficiently younger to permit a reasonable inference of age discrimination.").

Furthermore, a plaintiff may support an inference of discrimination in a number of ways, including, but not limited to, "comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by [the plaintiff's] supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010) (citing *Swierkiewicz v. Sorema*, 534 U.S. 506, 511–12 (2002)). Here, Pologruto was the hiring manager for the Assistant Director position and the chair of the search committee for the position. Evidence in the record indicates that Pologruto referred to black men as loud, drunk, and high on drugs on April 19, 2017. Pl.'s Opp'n Br., Ex. 5. Although Pologruto's reference to black men happened almost two years after NCC did not hire (or even interview) Wright for the position of Assistant Director of Student Life and Leadership Development, the court finds the statements allegedly made by Pologruto do suggest that racial animus could have existed at the time the search committee did not interview Wright. A reasonable fact finder could

---

[6] As for whether another employee is similarly situated to a plaintiff, the plaintiff need not be "identically situated;" instead, the plaintiff must "be similar in 'all relevant respects.'" *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222–23 (3d Cir. 2009) (citation omitted). When deciding whether the other employee is similarly situated, the "context of each case" determines the relevant factors to apply, "but [this] often includes a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 223 (citations and internal quotation marks omitted).

infer that a superior that utters such racial comments could more generally view an employee through a lens tainted with racial animus. Further, Pologruto, as chair of the search committee, did play a role in not granting Wright an interview and was closely involved in the employment decision.

At this stage, Wright need only "present sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated him less favorably than others because of his race." *Messina v. E.I. Dupont De Neumours & Co. Inc.,* 141 F. App'x 57, 59 (3d Cir. 2005) (per curiam) (internal citations omitted). "The evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent-i.e., that discrimination *could* be a reason for the employer's action.'" *Marzano v. Computer Science Corp.*, 91 F.3d 497, 508 (3d Cir. 1996). The evidence in the record before the court demonstrates that Wright had received positive reviews for nine straight years while serving as a Student Success Administrator at NCC's main campus as well as consistent favorable feedback once he returned to the Monroe campus. Pl.'s Opp'n Br., Exs. 26, 38. Courts have recognized that an adverse employment action following positive performance reviews can give rise to an inference of discrimination when taken together with other factors. *See Haskins v. Christiana Care Health Servs.*, 701 F. Supp. 2d 623, 631 (D. Del. 2010) ("Although courts have recognized that an employee's termination following positive performance reviews can give rise to an inference of discrimination, these cases generally involve at least one additional factor indicating that the shift from positive evaluations to termination was based on a discriminatory motive."). In short, the evidence viewed in the light most favorable to Wright is sufficient to support an inference of discrimination on account of age and race, which means that he is able to meet the requirements of establishing a *prima facie* case.

Since the court finds that Wright is able to establish a *prima facie* case of discrimination, the burden shifts to NCC, which must articulate a legitimate basis for the adverse employment action. *Burton*, 707 F.3d at 426. "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Id.* (internal quotation marks omitted). The court finds that the defendants have met this burden, as they have presented evidence that the NCC rejected Wright because he did not satisfy the degree requirements.

The burden of production therefore shifts back to Wright to present evidence from which a jury could find that NCC's stated reason is merely a pretext for discrimination. While the defendants maintain Wright cannot meet this burden, the court disagrees.

A plaintiff can establish pretext by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder *could* rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 764 (citation omitted). "At summary judgment, . . . a court must view these implausibilities, inconsistencies, incoherencies and contradictions, however weak, in the light most favorable to the non-moving party." *Andes v. N.J. City Univ.*, 419 F. App'x 230, 233 (3d Cir. 2011).

Here, viewing the facts in the light most favorable to Wright, a reasonable jury could find that the inconsistencies in NCC's purported reason for its actions could suggest that its stated reason is merely a pretext for discrimination. According to Wright, Pologruto initially told him that they did not consider him because he was an internal candidate, only to later explain that they did not consider him because he did not possess a Master's degree in Higher Education or Student Personnel Services. Wright Decl. at ¶ 8; Pologruto Dep. at 40–44. Moreover, with regards to the

race discrimination claim, Pologruto's alleged remarks could suggest racial animus. The comments made are not so detached to warrant rejecting them outright at this stage of the proceeding. *See Kerns v. Drexel Univ.*, Civ. A. No. 06-5575, 2008 WL 2876590, at *14 (E.D. Pa. July 24, 2008) ("The comments in this case, however, are not so stray as to reject them outright at this time. Kerns has offered a theory, supported with deposition testimony, that Carlton, motivated by racial animus, targeted him for mistreatment because he was white and directed Pompili to scrutinize his work more closely than that of other, nonwhite employees, resulting in his termination."). Given that when a court evaluates a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed," the court must deny summary judgment with regards to the discrimination claims as there is evidence that a reasonable jury could find that the stated reason given by the defendants is merely a pretext. *See Anderson*, 477 U.S. at 255. Therefore, Wright's discrimination claims will proceed to trial.

### 2.    Retaliation Claims

The defendants also seek summary judgment on Wright's unlawful retaliation claims under section 1981, Title VII, the ADEA, and the PHRA. To establish a *prima facie* case of unlawful retaliation under Title VII, the ADEA, and the PHRA, a plaintiff must provide evidence that "(1) []he engaged in protected activity; (2) the employer took an adverse employment action against [him]; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Nelson v. Upsala Coll.*, 51 F.3d 383, 386 (3d Cir.1995); *see Morrissey v. Luzerne Cty. Cmty. Coll.*, 117 F. App'x 809, 815 (3d Cir. 2004) (explaining that pursuant to *Fogleman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567 (3d Cir. 2002), identical analysis applies to retaliation claims under Title VII, ADEA, and PHRA). As for a section 1981 retaliation claim, the substantive elements of a claim under section 1981 are generally identical to the

elements of an employment discrimination claim under Title VII. *Estate of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 798 (3d Cir. 2010). In doing so, the plaintiff 'must have acted under a good faith, reasonable belief that a violation existed.'" *Castleberry v. STI Group*, 863 F.3d 259, 267 (3d Cir. 2017) (quoting *Daniels v. Sch. Dist. of Phila*, 776 F.3d 181, 193 (3d Cir. 2015)).

As with discrimination claims, if a plaintiff establishes a *prima facie* case of retaliation, the burden of proof shifts to the employer to produce a legitimate business reason for the adverse action. Once the employer tenders a purportedly non-retaliatory reason for the action, the burden shifts back to the plaintiff to present "some evidence, direct or circumstantial, from which a factfinder would reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely that not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

Here, it is undisputed that a complaint to the PHRC is a protected activity. *See Daniels*, 776 F.3d at 195 ("Daniels's formal complaints to the PHRC containing similar allegations of mistreatment based on age, race, and prior protected conduct unquestionably qualify as protected activities [under Title VII, the ADEA, and the PHRA]."); *Dixon v. Amerihealth Adm'rs*, Civ. A. No. 17-1520, 2017 WL 3189136, at *4 (E.D. Pa. July 27, 2017) ("Dixon's statement that she filed a charge of discrimination is sufficient to plead that she engaged in protected activity [under section 1981]." (citation omitted)). Wright also satisfies the second element, as it is clear that there was an adverse employment action given that the defendants ultimately terminated his employment.

When it comes to the third element, courts may consider "a broad array of evidence" in determining whether a plaintiff can establish a causal link. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000). "Such evidence may include a temporal proximity between the

protected activity and the adverse action, antagonistic behavior on the part of the employer, inconsistencies in the employer's articulated reasons for taking the adverse action, or any other evidence that supports an inference of retaliatory animus." *Reaves v. Pa. State Police*, 597 F. App'x 92, 97 (3d Cir. 2015). In this case, viewing the evidence in the light most favorable to Wright, he has identified sufficient evidence that reflects these factors.

While each piece of evidence alone may be insufficient to support a causal link between Wright's administrative complaints and his discharge, taken together the evidence is sufficient to support an inference of a pattern of antagonistic behavior. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 920–21 (3d Cir. 1997) ("[A] plaintiff can establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period."). Within a few months of the August 2016 PHRC fact-finding conference, Wright was experiencing antagonism from his supervisor, Austin, who had attended the fact-finding conference. *See* PSOF at ¶¶ 48–50. This developed after two straight years of favorable reviews from Austin. *See id.* at ¶ 47. Then, within two months of Wright's April 2017 PHRC charge (his second), Austin gives him his first unsatisfactory performance evaluation, even though she previously appointed him to the position of acting Student Life and Leadership Development Administrator on the Monroe campus and had indicated satisfaction with his work. *See id.* at ¶¶ 51–52. While it is unclear whether Austin knew of the April 2017 PHRC charge, Last definitely did as Wright had personally informed Last of the charge. *See id.* at ¶ 51.

A reasonable factfinder could find that the retaliation continued as Wright complained again at the end of June 2017 that his poor evaluation was retaliatory only to be put on the PIP about a month later in August. Pl.'s Opp'n Br., Exs. 21, 22. Austin and Last placed Wright on the PIP as opposed to any less severe progressive discipline such as a verbal or written warning.

Viewing the evidence in the light most favorable to Wright, the antagonism from Last and Austin began after the fact-finding conference and continued through termination. The court finds there is enough evidence for Wright to meet his *prima facie* burden of establishing a retaliation claim.

The burden therefore shifts to defendants to produce a legitimate business reason for Wright's termination. They have done so by maintaining that Wright failed to meet the goals of the extended PIP, and the burden therefore shifts back to Wright to prove that the reason given was pretextual.

Wright notes that despite all the requirements the defendants promulgated in the PIP and PIP extension, they told him at the termination meeting that they were firing him because he did not provide a thorough enough plan for using Twitter to promote the Monroe campus recreational/athletic facilities. *See* PSOF at ¶¶ 61–62, 64. At this stage of the case, the court must accept as true Wright's testimony as to what Last and Austin told him and leave any credibility determinations for the factfinder. A reasonable jury could find that the defendants' reason was merely a pretext for discrimination considering that there was no activity at all on the Monroe campus recreational/athletic facilities' Twitter account for the next 20 months (until October 2019), and Tucker, the athletic director, admitted that he had not even checked the Twitter feed. *See* Post-Termination Tweets; Pl.'s Opp'n Br., Ex. 35, Troy Tucker Dep. at 7, Doc. No. 39-35. Furthermore, Wright has also shown that Tucker was involved in his Twitter account development activities during the PIP periods and Tucker did not provide negative feedback regarding what Wright was accomplishing regarding the Twitter feed. *See* E-Mails. Therefore, a reasonable jury could find the defendants' purported concern about Wright's lack of Twitter activity to be disingenuous.

Additionally, Wright's performance had been rated satisfactory every year from 2004-2016. *See* Performance Reviews; May 2016 Performance Review; May 2015 Performance Review. Wright can also rely on this evidence of good performance, in conjunction with the other evidence of record, to show pretext because the defendants are relying on poor performance as the reason for termination. *See Tomasso v. The Boeing Co.*, 445 F.3d 702, 708 (3d Cir. 2006) (holding that employee can show pretext by affirmative external evidence of good performance); *see also Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1073 (3d Cir. 1996) (concluding, in constructive discharge case, that evidence of "more than a decade of satisfactory performance," in conjunction with other evidence, was sufficient to show pretext); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 337 (3d Cir. 1995) (Roth, J., dissenting) ("Although we have repeatedly recognized that employees can rely on evidence of good performance to show pretext, in those cases the employers have inevitably relied on poor performance as a reason for termination."); *Komis v. Perez*, Civ. A. No. 11-6393, 2014 WL 2738189, at *2 (E.D. Pa. June 16, 2014) ("Viewing the evidence in the light most favorable to Komis, a reasonable jury could conclude that [the supervisor] was using the unaddressed hostility within the office toward Komis, who up to that time had good performance evaluations, as a pretext for excluding Komis from the hiring process because she had engaged in protected activity."); *Buffington v. PEC Management II, LLP*, 2013 U.S. Dist. LEXIS 43089, at * 23, 2013 WL 1290232, at *8 (W.D. Pa. 2013) (finding material issue of fact regarding pretext when employer terminated employee for poor performance, yet employee was "never given a poor performance review, received pay raises, was never disciplined, and was a long-term employee"). The timing and the underlying 2015 discrimination complaint further serve as evidence of pretext, as a work atmosphere allowing discrimination

"increases the likelihood of retaliation for complaints in individual cases." *Glass v. Phila. Elec. Co.*, 34 F.3d 188, 195 (3d Cir. 1994) (citation omitted)).

The defendants contend that for Wright to prevail on his retaliation claim, he must show that his protected activity was the "but-for" cause of the adverse employment action, as opposed to a mere pretext for retaliation. Defs.' Br. at 11–12 ("[T]o survive summary judgment, Plaintiff must provide sufficient evidence to create an issue of material fact that his PHRC complaint was the 'but-for' cause of his termination." (citations omitted)). While the defendants are correct as to Wright's burden **at trial**, they misstate his burden at this (*prima facie*) stage because he need only "produce evidence 'sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse [employment] action.'" *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017) (quoting *Kachmar v. Sunguard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997)); *see Jones v. Serv. Elec. Cable TV, Inc.*, No. 19-2522, -- F. App'x --, 2020 WL 1887789, at *3 (3d Cir. Apr. 16, 2020) (explaining, at summary judgment stage, employee had burden to show pretext by identifying "'evidence sufficient to raise the inference that [his] protected activity was the *likely reason* for the adverse [employment] action'" (alteration in original) (quoting *Carvalho-Grevious*, 851 F.3d at 259)). The court finds that Wright has produced evidence sufficient to raise the inference that his complaints to the PHRC were the likely reason for the termination of his employment. Viewed in totality, the evidence creates an issue of material fact that is best left to a jury.[7] Therefore, the court will deny the motion for summary judgment on the retaliation claim.

### 3.   Individual Liability against Last and Austin

---

[7] The defendants further maintain that Wright has not shown a pattern of antagonism or other evidence that his termination was based on his PHRC complaint. However, the court finds that there is a genuine dispute as to material facts and that a reasonable jury could find that such a pattern of antagonism existed.

The defendants next argue that Wright cannot establish individual liability against Last and Austin under section 1981 as he cannot provide sufficient evidence of retaliation. Defs.' Br. at 13–15. For the reasons already discussed, this court finds that a reasonable jury could conclude that Austin and Last required Wright to complete a PIP as a pretext to fire him in retaliation.

The defendants further argue that Last and Austin are entitled to qualified immunity. *Id.* at 15–16. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). In addressing whether defendants are entitled to qualified immunity,

> [the court] conduct[s] a two-part inquiry. [The court] first determine[s] whether a right has been violated. If it has, [the court] then must decide if the right at issue was clearly established when violated such that it would have been clear to a reasonable person that her conduct was unlawful.

*Williams v. Sec. Pa. Dep't of Corr.*, 848 F.3d 549, 557 (3d Cir. 2017) (citation omitted).

The defendants maintain that Wright cannot establish the violation of a "clearly established" right as they maintain that Last and Austin were unaware of Wright's complaint at the time that Wright was given a negative evaluation and placed on the PIP. Defs.' Br. at 15. The evidence in the record demonstrates that in August 2016 the PHRC convened a fact-finding conference regarding Wright's first discrimination complaint that Last and Austin attended, and it was from this point forward that Wright's relationship with Last and Austin began to deteriorate. Furthermore, according to Wright's version of the events, he specifically notified Last that he would be filing a second complaint with the PHRC, this time alleging retaliation, and Austin's unsatisfactory performance evaluation of Wright came two months after this retaliation complaint. *See* PSOF at ¶¶ 51–52. At bottom, Wright has demonstrated that there is evidence to support his

25

discrimination and retaliation claims, and he has shown that there are disputed issues of material fact as to whether the defendants violated Title VII, the ADEA, and/or section 1981. Therefore, this court cannot find that Austin and Last are entitled to qualified immunity.

## IV.    CONCLUSION

The court will deny the defendants' motion for summary judgment because there are genuine issues of material fact which preclude judgment as a matter of law at this stage. When considering the evidence of the record in the light most favorable to Wright, and resolving all inferences in Wright's favor, Wright has met his burden when it comes to his discrimination and retaliation claims. In addition, Last and Austin are not entitled to qualified immunity.

A separate order follows.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.